JUDGE BRODERICK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



NATHAN CURRIER,

Index No. _____

                    Plaintiff,

          -against-

**COMPLAINT**



AMERICAN FEDERATION OF
MUSICIANS, ASSOCIATED MUSICIANS
OF GREATER NEW YORK, LOCAL 802,

                    Defendant.

          Plaintiff Nathan Currier ("Mr. Currier"), by his attorneys Quinn Emanuel Urquhart &

Sullivan, LLP, states as follows as and for his Complaint against Defendant American Federation

of Musicians, Associated Musicians of Greater New York, Local 802 ("Local 802"):

### NATURE OF THE ACTION

          1.          This action seeks a declaratory judgment that Local 802 has no right to restrict

Mr. Currier's use of a recording in his possession (the "Recording") of *Gaian Variations*, a

three-part oratorio that he composed and that the musicians of Local 802 (along with various

soloists and a choir who were separately engaged by Mr. Currier and were not Local 802

members) were to perform on April 21, 2004 (the "Concert"). For the Concert, Mr. Currier

entered into a Letter of Agreement (the "Agreement") with the Brooklyn Philharmonic

Symphony Orchestra ("BPO"), pursuant to which BPO agreed to, *inter alia*, engage Local 802

musicians to perform the Concert. Local 802 was not a party to the Agreement, but instead, with

respect to certain, limited conditions expressly stated in the Agreement, was at best a third-party

beneficiary of the Agreement having at most the same rights and defenses available to the BPO under the Agreement.

2.     Pursuant to the Agreement, Mr. Currier was entitled to make a recording of the Concert provided that he first obtained the permission of BPO. The Agreement also stipulated that the act of making such a recording would require the payment of additional fees to the musicians "as outlined by Local 802."

3.     Prior to the Concert, Mr. Currier asked for and was granted BPO's permission to make a recording of the Concert. Having obtained BPO's assent, Mr. Currier retained an audio recording professional who ultimately recorded the performance. Mr. Currier is now in possession of that recording (*i.e.*, the Recording).

4.     The Agreement also entitled Mr. Currier to a concert three hours in length. However, the actual Concert as performed by BPO and Local 802 was significantly shorter than three hours and failed to include major parts of the *Gaian Variations* composition. More than 20 percent of the complete work's libretto was never sung. Crucially, the abbreviated performance did not include the Finale of *Gaian Variations* and thereby materially detracted from the artistic quality of the piece.

5.     BPO's failure to deliver a full three-hour concert prompted Mr. Currier to file a lawsuit against BPO in the New York Supreme Court for Kings County (Index No. 7661/2009), in which Mr. Currier asserted that BPO's premature termination of the Concert constituted a material breach of the Agreement and, consequently, relieved him of any obligations under the Agreement. Local 802 was aware of the lawsuit (counsel for Local 802 also served as counsel for BPO), although it was not a party to the case or the subsequent settlement agreement between Mr. Currier and BPO.

6.      Mr. Currier intended *Gaian Variations* to be an artistic commentary on climate change and sincerely believes that his work can promote awareness and discussion of this important scientific and political issue.  As a result, Mr. Currier wishes to reproduce and disseminate the Recording to the public.

7.      To date, Mr. Currier has not reproduced or disseminated the Recording because Local 802 has insisted that they have the ability to control the use of the Recording and have demanded in excess of $100,000 as payment for Mr. Currier's intended use of the Recording. Over a period of more than seven months, Mr. Currier engaged in repeated attempts to reach a mutually beneficial agreement with Local 802 whereby there would be no upfront payment to Local 802 for Mr. Currier's use of the Recording, and, in exchange, Local 802 would receive the majority of any profits made by Mr. Currier arising from the use of the Recording.  Mr. Currier engaged in these attempts not because Local 802 has any rights to the Recording, but rather to avoid litigation against fellow musicians.

8.      Local 802 has been unreceptive to Mr. Currier's overtures and has taken the position that Mr. Currier is bound by certain provisions governing the use of recordings that are found in a Collective Bargaining Agreement between Local 802 and BPO (the "CBA").  Indeed, Local 802 has asserted that under the CBA, Mr. Currier would be required to pay Local 802 approximately $120,000 to use the Recording.  Local 802 has adopted this stance even though Mr. Currier is not a party to the CBA and even though the Agreement does not incorporate any of the provisions of the CBA concerning audio recordings.  Counsel for Local 802 has confirmed that Local 802 will maintain this legally unfounded position and would demand payment should Mr. Currier seek to use the Recording.

9.      Local 802's legally invalid assertions have caused Mr. Currier to become concerned that his lawful use of the Recording will prompt a baseless lawsuit against him by Local 802. Consequently, Mr. Currier seeks a declaration that: (a) Mr. Currier is not bound by the provisions of Article 15 of the CBA regarding fees for audio recordings because he is not a party to the CBA and because the Agreement did not incorporate Article 15 of the CBA; (b) Local 802 cannot enforce any provision of the Agreement, including those pertaining to sound recordings, against Mr. Currier because Local 802 is at best a third-party beneficiary having only the same rights as BPO and because BPO materially breached the Agreement; (c) Mr. Currier authored the *Gaian Variations* sound recording and holds copyright in the Recording; and (d) Local 802 has no right to restrict Mr. Currier from using the Recording as he sees fit.

## THE PARTIES

10.     Plaintiff Nathan Currier is an individual and musical composer who currently resides in the State of New Jersey.

11.     Defendant American Federation of Musicians, Associated Musicians of Greater New York, Local 802 is an unincorporated association and labor organization that represents musicians for the purpose of collective bargaining regarding their wages, hours, and conditions of employment. Local 802's principal place of business is in New York, New York, and Local 802 maintains an office at 322 West 48th Street, New York, New York 10036.

12.     Non-party BPO is an organization that provides for and arranges musical performances. BPO is considered a "freelance" orchestra, as its musicians are not employed full time, but rather are paid on a per-performance basis. In 2004, at the time of the *Gaian Variations* Concert, BPO had entered into the CBA with Local 802.[1]

---

[1]  A copy of the CBA is attached hereto as Exhibit A.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 28 U.S.C. § 1338.

14.     This Court has personal jurisdiction over Local 802 pursuant to Fed. R. Civ. P. 4(k)(1)(A) and N.Y. C.P.L.R. § 301.  Defendant maintains its principal place of business in New York County, and a substantial part of the events giving rise to Mr. Currier's action occurred in New York County.

15.     Venue lies in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this judicial district, and because a substantial part of the events giving rise to this action occurred in this judicial district.

## FACTUAL BACKGROUND

16.     Mr. Currier is a musical composer whose compositional style has been described by renowned music critic Tim Page as "engaging, virtuosic and richly inventive . . . with no seeming allegiance to any creed but the most valuable one of all – that of creating a succinct, personal, well-crafted music."  Mr. Currier is a winner of the Academy Award, given for lifetime achievement, from the American Academy of Arts & Letters, as well as the Rome Prize and Guggenheim Fellowships.  He has received the Fulbright, National Endowment for the Arts, NYFA, Fromm, Ives, Barlow and ASCAP prizes, and was the 2008 winner of the International Sackler Prize for Composition for his *Piano Concerto*.

17.     Mr. Currier is also actively involved with climate science, and since 2007, has been a member of Al Gore's Climate Project.  He has previously served as Senior Climate Advisor and methane specialist for Public Policy Virginia and has spoken on the subject of climate change in various forums including Columbia University, New York University, and UNICEF Headquarters at the United Nations.  Since 2011, Mr. Currier has also been writing

about climate issues for the *Huffington Post*. In 2011, Mr. Currier co-authored a chapter of the book *Chimeras and Consciousness* (MIT Press, 2011) with NASA geophysicist Dr. Paul D. Lowman concerning Gaia theory (or Earth Systems Science), which views the Earth as a single self-regulating entity.

18.     Between 1998 and 2003, Mr. Currier acted on his two passions—music and climate change science—and composed the first and only musical composition about the origins, growth, and implications of the science of Gaia, a three-part oratorio entitled *Gaian Variations*. The Concert, which was to perform *Gaian Variations* for an Earth Day event, was intended to raise awareness of and promote discussion concerning the importance of confronting climate change.

### BPO and Mr. Currier's Agreement

19.     On August 8, 2003, Mr. Currier engaged the BPO for "one performance of *Gaian Variations* at Avery Fisher Hall." The Agreement, attached as Exhibit B, was signed by Mr. Currier on behalf of himself d/b/a C & I Music Productions, and by Catherine Cahill, who was then BPO's CEO, on behalf of BPO. The "Type of Service" for the performance was specified as "one Concert (3 hours or under)" and three rehearsals in advance of the Concert. *Id.* For the engagement, Mr. Currier would and did pay $72,000 to the BPO, the majority of which went to the musicians of Local 802. Mr. Currier also provided a written score and demo recordings of *Gaian Variations*.

20.     BPO commonly commissions a composer to write a piece, which BPO then performs under the direction of its Music Director. Here, however, Mr. Currier composed the work on his own and acted as the producer of the Concert. As producer, Mr. Currier retained creative control of the performance while BPO acted as an orchestra for hire. The creative

choices involved in adapting *Gaian Variations* to the performance that was captured in the Recording were Mr. Currier's to make.

21. Pursuant to the Agreement, BPO agreed to coordinate with the musicians of Local 802, who would be responsible for performing and rehearsing the piece.

22. Under the Agreement, Mr. Currier was responsible for: (1) "[a]rranging, contracting, and paying for the performance space (Avery Fisher Hall) and all related aspects of the concert including but not limited to all production, marketing, and PR expenses;" (2) "[a]rranging and paying for separate rehearsal space;" (3) "[p]aying Brooklyn Philharmonic for all orchestra fees relating to [the] event;" (4) "[e]ngaging and paying for soloists, choirs and conductor;" (5) "[p]aying for all equipment rentals, piano tunings, etc.;" and (6) "[p]aying and arranging for music performance rights and orchestral parts." *Id.* at 2. Mr. Currier fully performed each of these obligations, and ultimately poured his life savings into the Concert, spending nearly $170,000 in total.

23. BPO, meanwhile, was responsible for: (1) "[e]ngaging all musicians;" (2) "[f]iling the Union contract with Local 802;" (3) "[a]cting as a payroll company for and running the musicians [*sic*] payroll;" and (4) "[p]roviding a production manager to assist at rehearsal and concert." *Id.*

24. Mr. Currier fulfilled his responsibilities under the Agreement and performed all requisite conditions precedent, if any existed. In advance of the Concert, he secured the performance space; arranged and paid for public relations; held scheduled rehearsals in a separate space; engaged soloists, a choir, and a conductor; and undertook any and all other tasks to ensure that *Gaian Variations* would be performed as composed.

25.     Mr. Currier's artistic supervision of the Concert included the selection of a conductor, soloists, choir, and "walk-on" performers; selection of the distribution of string instruments, which is not set in the score for *Gaian Variations*; instruction and preparation of soloists; participation and creative instruction during rehearsals; and instruction of the conductor following rehearsal.  As BPO's former CEO acknowledged, the "[m]usical choices, timings, etc. were the prerogative of" Mr. Currier; "[a]ll aspects of the artistic planning, ticket sales, and marketing were controlled by the composer, Nathan Currier."

### The Collective Bargaining Agreement

26.     Pursuant to the CBA, three hours was the maximum performance time under the musicians' standard wage scale for an engagement such as *Gaian Variations*.  Any time onstage over three hours would be billed at "[o]ne and one-half (1½) times the above hourly rate in segments of fifteen minutes or fraction thereof."

27.     Pursuant to § D(2) of the CBA, the three-hour time limit included "rest break" conditions as follows:

> Breaks Generally (Including Rehearsals):  Musicians shall not be required to rehearse without a break for more than one and one-quarter hours (75 minutes); provided, however, that musicians may be required to play for up to one and one-half (1½) hours without a break if the performance time of a movement exceeds one and one-quarter (1¼) hours.  **No break shall be for less than ten (10) minutes away from the stand.  Breaks in performance shall be no less than twenty (20) minutes away from the stand without permission of the Orchestra Committee.**

28.     For *Gaian Variations*, BPO appointed Stephanie Yeh as the production manager. She was responsible for understanding the requirements of the CBA and communicating them to Mr. Currier.  In the event that she was unsure about a particular provision, Ms. Yeh would clarify her understanding with Jonathan Taylor, the personnel manager of BPO (responsible for managing the Local 802 musicians), and other superiors at BPO.

29.     When Mr. Currier consulted BPO regarding union rules for rest breaks before the concert, he was informed by Ms. Yeh that two intermissions lasting at least 10 minutes each would comply with the union rules.  She expressly told Mr. Currier that "since [BPO] generally [had] a 20 minute intermission that two 12-minute intermissions would suffice since that is 22 minutes [*sic*]."  In a meeting less than a week before the performance, Ms. Yeh and Robert Ross, another BPO production manager, confirmed this understanding of the union rules.

30.     Based on these conversations, Mr. Currier believed that his three-part oratorio would meet the intermission requirements, and that the entirety of *Gaian Variations* could be performed within the three-hour allotted time, without the need for any overtime.

### The Letter of Agreement Did Not Incorporate the Provisions of the CBA Regarding Audio Recordings

31.     The only provision in the Agreement that specifically addresses Local 802's CBA with BPO reads as follows:  **"It is agreed that this *service* is subject to the rules and regulations established by the American Federation of Musicians, Associated Musicians of Greater New York, Local 802, and the Brooklyn Philharmonic's Collective Bargaining Agreement with Local 802."** (emphasis added).  Per its express terms, this provision only establishes that the service (*i.e.*, the Concert) was subject to the provisions of the CBA regarding the Local 802 members' rights during musical performances.  It did not incorporate any of the other provisions of the CBA, including those regarding audio recordings.

### Mr. Currier Made a Lawful Recording of the Concert With BPO's Permission

32.     Pursuant to the Agreement, Mr. Currier was entitled to make an audio recording of the Concert provided that he first obtained BPO's permission.  Prior to the Concert, Mr. Currier requested permission from BPO to make a recording of the Concert.  BPO ultimately granted Mr. Currier such permission.  As a result, Mr. Currier retained Larry Rock, the sound

engineer for the New York Philharmonic, to record the Concert. Mr. Currier is now in possession of the Recording made by Mr. Rock.

### The Performance of *Gaian Variations*

33.     The performance of *Gaian Variations* was set to begin on April 21, 2004, at 8:00 P.M. at Lincoln Center's Avery Fisher Hall in New York, New York.

34.     Rather than the bargained-for three-hour concert (180 minutes), which included at least twenty minutes in total rest breaks, what transpired was an incomplete performance lasting only 159 minutes, during which  BPO played for 130 minutes and took 29 minutes worth of "rest break."

35.     The Concert did not begin on time at 8:00 P.M. because BPO's production manager, Ms. Yeh, held the curtain until 8:05 P.M. In her deposition in *Currier v. Brooklyn Philharmonic Orchestra*, Ms. Yeh stated that she held the curtain "because not everyone [in the orchestra] was in their places on time."

36.     Act I of the Concert was played with slower tempi than dictated in the score and lasted 58 minutes, finishing around 9:03 P.M. The first intermission was approximately 15 minutes long. During this intermission, no BPO employee approached Mr. Currier or the conductor, Mr. Harold Rosenbaum, to express any concern about potential overtime. Act II was also played with slower tempi, and concluded around 10:12 p.m.

37.     The second intermission followed Act II and was scheduled to last 12 minutes, but was delayed by an emergency meeting between Mr. Currier and BPO officials. While escorting Mr. Currier to this emergency meeting, Ms. Cahill (the CEO of BPO) put forward an entirely new interpretation of the rest break provision. According to Ms. Cahill, each of the two intermissions must be counted as at least 20 minutes, even if the actual duration was less than 20

minutes; thus, the intermissions together accounted for 40 minutes of the total 180 minute performance time, meaning that the Concert was headed into overtime.

38.     With no option but to accept Ms. Cahill's position, Mr. Currier begrudgingly agreed to cut three movements (movements 34-36) from the middle of Act III, thereby ensuring the Finale of *Gaian Variations* would be played.  It was critical that the Finale be played because it is central to the entire work's message and to the artistic integrity of the piece as a whole.

39.     The curtain rose on Act III at approximately 10:27 P.M.  According to the written score and demo recordings generated by Mr. Currier and provided to BPO, Act III was considerably shorter than the two preceding Acts and should take approximately 35 minutes to play in its entirety.

40.     At only 10:44 P.M., with just the Finale remaining to be played of what was then the abridged work, Mr. Taylor, BPO's personnel manager, abruptly signaled Mr. Rosenbaum, the conductor, to end the Concert.  Mr. Rosenbaum set down the baton, thanked the orchestra, and exited the stage.

41.     Even at the slower tempi BPO took, the Finale, which had been rehearsed at the proper tempo, would have been completed in less than 14 minutes.  With Mr. Currier's edits, the final note of the abridged *Gaian Variations* would have sounded by 10:58 P.M.—seven minutes before 11:05, which time marked the end of the three hours Mr. Currier was entitled to under the Agreement.

### Mr. Currier's Lawsuit Against, and Settlement with, BPO

42.     BPO materially breached the Agreement with Mr. Currier by performing for substantially less than three hours, unilaterally inflating the time to be deducted for rest breaks, and cutting the Finale out of *Gaian Variations*.  In addition to cutting the Finale, BPO's actions

caused much of Act III to be cut. As a result of BPO's breach, 1,461 of the 6,835 words of the oratorio's libretto, or about 21 percent, were never sung.

43.     On March 10, 2009, Mr. Currier filed suit against BPO for breach of contract. The case was litigated over the next few years. Following the denial of BPO's motion for summary judgment, *see Currier v. Brooklyn Philharmonic Symphony Orchestra*, 39 Misc. 3d 1223(A) (N.Y. Sup. Ct. Kings Co. May 6, 2013), Mr. Currier and BPO settled the action as between them.

### The Importance of *Gaian Variations* and Negotiations with the Local 802

44.     Mr. Currier has tried repeatedly to reach an amicable resolution of his dispute with Local 802 concerning the use of the Recording of *Gaian Variations*. The dispute centered on the fact that Local 802 claims to have a right under the CBA to place restrictions on the duplication or use of the Recording and demands compensation for such use, even though Mr. Currier is not a party to the CBA and the Agreement does not incorporate any of the provisions of the CBA regarding audio recordings.

45.     Mr. Currier does not seek to exploit the Recording for his own financial gain. Indeed, as Mr. Currier made clear by a letter dated April 9, 2014 to Local 802, he is driven by the desire and need to disseminate the critical message concerning climate change to the public:

You might see my proposal in terms of rights you believe that you have with respect to the recording, and the financial benefit you believe you are entitled to by demanding upfront payments. But certainly no CD can be made if there has to be any advance payment. It would be some small part of turning failure to success if we can come to an agreement together now–and would be in the best interest of all parties involved.

What's driving me is hardly anger at Local 802, nor at the Brooklyn Philharmonic. Rather, what's driving me is exactly what drove me to first write the piece. My piece is even more pertinent today than it was in 2004, and its message is, in my opinion, now that much more urgent.

This clearly isn't about money to me. This is about the work and how to get it out there as much as is possible. Nearly a decade ago, I poured my life savings into the failed concert the Brooklyn Philharmonic Orchestra performed, and am now proposing an agreement by which I can make a partial CD of it, and to put up parts of it on the internet, in order to share some of the message of my piece with the public. And, as I have previously stated, the majority of any profits would go to the musicians who were involved in the performance.

46.     There is a great deal of outside interest in and desire to hear this important and unique work. For instance, in January 2014, a representative of the Science Museum of London contacted Mr. Currier asking if the Museum could display the score of *Gaian Variations* in an upcoming exhibit organized through their Climate Changing Program. The score is currently on display as part of the exhibit, but the message of the oratorio is far more powerful when heard. Accordingly, it is Mr. Currier's belief that permitting the public to hear *Gaian Variations*, for example on a CD containing portions of the Recording, would promote further public discourse and education on Gaia theory (Earth Systems Science) and climate change.

47.     Local 802 has repeatedly asserted the legally unfounded position that the CBA both grants it the right to restrict Mr. Currier's use of the Recording and entitles it to a fee of approximately $120,000 in the event that Mr. Currier actually uses the Recording. However, Mr. Currier is not a party to the CBA and the Agreement does not incorporate any terms of the CBA governing audio recordings of works performed by its musicians.

48.    Despite Local 802's legally suspect assertions, Mr. Currier has attempted to negotiate with Local 802 in good faith so as to avoid litigation. In the process, Mr. Currier has even gone so far as to offer the musicians a majority of any profits derived from the Recording of *Gaian Variations* despite Local 802 having no legal right to such benefit. Local 802, however, has evidently decided that it is better that the Recording be stowed away forever, thereby depriving the musicians of the possibility of further compensation for the Concert and depriving the public of the benefit of hearing portions of Mr. Currier's provocative and important work.

49.    Local 802 has no basis to demand payment or to threaten enforcement of its purported rights, because it *has* no rights to the Recording of *Gaian Variations* under copyright law, the Agreement or otherwise. Mr. Currier, not Local 802, authored the *Gaian Variations* sound recording. Moreover, Mr. Currier is not a party to the CBA, and the Agreement did not incorporate any of the CBA's terms regarding audio recordings. As a result, Mr. Currier is not bound by any provision of the CBA concerning audio recordings. Any rights Local 802 has to restrict Mr. Currier's rights to use the Recording must, therefore, arise from the Agreement. However, even if Local 802 had such rights under the Agreement, BPO's material breach of the Agreement relieved Mr. Currier of any obligations arising thereunder. BPO's unilateral decision to truncate the performance went beyond the scope of the permission Mr. Currier granted BPO and Local 802 to perform the piece under his direction and constituted a material breach of the Agreement.

50.    Because Local 802 is not a party to the Agreement, it is at best a third-party beneficiary of that contract with no greater rights thereunder than BPO. Therefore, any rights Local 802 may have under the Agreement are unenforceable against Mr. Currier because of BPO's material breach of the Agreement.

## FIRST CAUSE OF ACTION
### (for a declaratory judgment)

51.    Mr. Currier repeats and realleges each of the allegations set forth in paragraphs 1 through 50 above as if fully set forth herein.

52.    Local 802 has demanded substantial upfront payments should Mr. Currier seek to use the Recording and has indicated that it will seek to enforce its purported rights should Mr. Currier use the Recording.

53.    There presently exists a justiciable controversy between Mr. Currier and Defendant Local 802 with respect to whether Local 802 has any rights in or to the Recording of *Gaian Variations* from the April 21, 2004 Concert, given that Mr. Currier authored the Recording under copyright law, Mr. Currier is not a party to the CBA, the Agreement did not incorporate any of the terms of the CBA regarding sound recordings, and BPO's material breach of the Agreement extinguished any rights Local 802 may have had under that contract.

54.    Accordingly, this Court should declare that: (a) Mr. Currier is not bound by the provisions of Article 15 of the CBA regarding fees for audio recordings because he is not a party to the CBA and because the Agreement did not incorporate Article 15 of the CBA; (b) Local 802 cannot enforce any provision of the Agreement, including those pertaining to sound recordings, against Mr. Currier because Local 802 is at best a third-party beneficiary having at most the same rights thereunder as BPO and because BPO materially breached the Agreement; (c) that Mr. Currier authored the *Gaian Variations* sound recording and holds copyright in the Recording; and (d) Local 802 has no right to restrict Mr. Currier from using the Recording as he sees fit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nathan Currier seeks judgment as follows:

A.      a declaration that: (a) Mr. Currier is not bound by the provisions of Article 15 of

the CBA regarding fees for audio recordings because he is not a party to the CBA and

because the Agreement did not incorporate Article 15 of the CBA; (b) that Local 802

cannot enforce any provision of the Agreement, including those pertaining to sound

recordings, against Mr. Currier because Local 802 is at best a third-party beneficiary

having at most the same rights thereunder as BPO and because BPO materially breached

the Agreement; (c) that Mr. Currier authored the *Gaian Variations* sound recording and

holds copyright in the Recording; (d) Local 802 has no right to restrict Mr. Currier's from

using the Recording as he sees fit; and


B.      such other relief as the Court deems proper.

DATED:   New York, New York
         April 2, 2015

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____

Rollo C. Baker
rollobaker@quinnemanuel.com
John Sullivan
johnsullivan@quinnemanuel.com
Nicholas A. Hoy
nicholashoy@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

*Attorneys for Plaintiff Nathan Currier*

# Exhibit A

COLLECTIVE BARGAINING AGREEMENT

between

BROOKLYN PHILHARMONIC SYMPHONY ORCHESTRA, INC.

and

ASSOCIATED MUSICIANS OF GREATER NEW YORK
LOCAL 802, AMERICAN FEDERATION OF MUSICIANS, AFL-CIO

SEPTEMBER 12, 2001 through SEPTEMBER 11, 2004



DEFENDANT'S
EXHIBIT
H
4/19/12    D.

BROOKLYN PHILHARMONIC ORCHESTRA
TABLE OF CONTENTS

Scope of Agreement......................................................................................................1
Article 1.  Recognition ...................................................................................................1
Article 2.  Union Security and Dues Checkoff ...............................................................1
          A.  Members in good standing.............................................................1
          B.  Work dues......................................................................................1
Article 3.  Grievance and Arbitration Procedure ...........................................................1
          A.   Definition ......................................................................................1
          B.   Procedure ................................................................................1-2
          C.   Arbitrator's authority...................................................................2
Article 4.  No Strike -- No Lockout ................................................................................3
Article 5.  Auditions....................................................................................................3-5
Article 6.  Tenure......................................................................................................5-10
          A.   Tenure Acquisition......................................................................5
          B.   First Call......................................................................................5
          C.   Guarantee of Work ....................................................................6
          D.   Order of Engagement.................................................................6
          E.   Instrumentation ..........................................................................7
          F.   Hiring........................................................................................7-8
          G.  Attendance Obligations ..........................................................8-10
Article 7.  Maintenance of Benefits..............................................................................10
Article 8.  Wages and Other Compensation ...........................................................10-12
          A.   Performances............................................................................10
          B.   Ballet and Opera.......................................................................11
          C.   Personnel Manager and Staff Librarian.....................................12
          D.   Cartage .....................................................................................12
          E.   Mileage .....................................................................................12
          F.   Run-Out Engagements...............................................................12
          G.   Educational Services .................................................................12
Article 9.  Health Benefits.......................................................................................12-13
Article 10. Hospitalization.............................................................................................13
Article 11. Pension ................................................................................................13-14
          Tax Deferred Annuity .........................................................................14
Article 12. Payment to Musicians.................................................................................14
          A.   No cost to Musicians..................................................................14
          B.   Late payment penalty.................................................................14
          C.   Cancellation...............................................................................14
Article 13. Service Conditions ...............................................................................14-15
          A.   Rehearsals .................................................................................14
          B.   Rehearsal Release.....................................................................14
          C.   Personal and Sick Day, Bereavement Leave .............................15
          D.   Rest Breaks ...............................................................................15
             Rehearsals ...............................................................................
             Breaks Generally (including Rehearsal).....................................
          E.   Number of Services and Cumulative Time of Services Per Day....15
          F.   Starting Time..............................................................................15
          G.   Wednesday Afternoon rehearsals .............................................15
          H.   Sound Checks ...........................................................................15
Article 14. No Discrimination .......................................................................................16
Article 15. Recording...............................................................................................16-17
Article 16. Radio Broadcasts..................................................................................17-18
Article 17. Facilities ....................................................................................................18
Article 18. Leave of Absence.................................................................................18-19

Article 19.   Miscellaneous................................................................................................19-20
              A.   Music Preparation...................................................................................19
              B.   Synthesizer............................................................................................19
              C.   Definition of Service...............................................................................19
              D.   Identity of Orchestra.............................................................................19
              E.   Full Instrumentation.............................................................................19
              F.   Names of Orchestra members.............................................................19
              G.   Chamber Music Performances............................................................19
              H.   Public Access Cable Television............................................................19
              I.   Stage Deportment.................................................................................19
              J.   Working Conditions...............................................................................20
Article 20.   Health and Safety Concerns..............................................................................20
Article 21.   Ratification.........................................................................................................20
Article 22.   Term of Agreement ...........................................................................................20
Roster 2001-2002...............................................................................................................21-24

SCOPE OF AGREEMENT

AGREEMENT made this 18th day of April, 2002  by and between BROOKLYN PHILHARMONIC SYMPHONY ORCHESTRA, INC. ("The Employer" or "Management") and ASSOCIATED MUSICIANS OF GREATER NEW YORK, LOCAL 802, AMERICAN FEDERATION OF MUSICIANS, AFL-CIO ("the Union").  The Agreement covers the wages, hours and terms and conditions of employment of all musicians ("Employees") employed by the Employer for symphonic, chamber orchestra, choral and opera-in-concert form, opera and ballet performances and rehearsals.

ARTICLE 1 - RECOGNITION

A.      The Employer recognizes the Union as the exclusive collective bargaining representative of all musicians it engages during the term of this Agreement, and recognizes the rights and obligations of the Union to negotiate the wages, hours and terms and conditions of employment of musicians and to administer this Agreement on their behalf. The Employer further recognizes the Orchestra Committee as an initial body which shall deal with the Employer as representative of the Union in matters concerning the administration of this Agreement, which Committee shall work with Union in discharging its duties.

B.      The Employer shall recognize the Artistic Advisory Committee as the body which shall represent the Orchestra's advice on artistic matters not otherwise covered by the Collective Bargaining Agreement, such as programming, choice of venues, guest conductors, radio tapes and related matters.

C.      The Employer, in consultation with respective committee chairmen/women, will schedule separate meetings twice yearly with the Orchestra Committee and the Artistic Advisory Committee.  The location and agenda for the meetings will be mutually agreed upon by both parties before the start of each meeting.

ARTICLE 2 - UNION SECURITY AND DUES CHECKOUT

A.      All musicians covered by this Agreement shall, as a condition of employment, be members in good standing of the Union no later than the thirtieth day following the beginning of employment thereunder or the execution of this Agreement, whichever is later; provided, however, that those musicians who are members of the Union as of the date of signing of  this Agreement shall remain so for its duration.

B.      The Employer agrees to deduct from each musician's pay lawful union dues, work dues and initiation fees, if any, and to remit same to the Union each time musicians are paid, in accordance with submission to it of lawful dues deduction authorizations signed by musicians.

ARTICLE 3 - GRIEVANCE AND ARBITRATION PROCEDURE

A.      Definition:

A "grievance" shall be defined as a dispute between the Employer and the Union concerning the interpretation or application of a specific provision of this Agreement, and/or notice of dismissal for non-artistic reasons.

B.      Procedure:

All grievances shall be resolved in the following manner (with the exception of dismissal for artistic reasons, the procedure for which is described in paragraph D).

The Employer must give written notice of discipline or discharge for just cause, setting forth all reasons on which such notice is based, no later than five (5) days after the event or act giving rise to such notice. Copies of such notice shall simultaneously be provided to the Orchestra Committee and the Union.

Step 1 - Any grievance shall first be taken up with the Employer by the musician, a Committee designated by the Union in accordance with its Constitution and by-laws and/or a Union representative not later than sixty (60) days after the orchestra's last concert of the season in which the event which gave rise to the grievance occurred, or the date on which the Union knew or should have known of such event, whichever is the later. The parties shall attempt in good faith to resolve the grievance in a manner which gives effect to the terms of the Agreement. The Employer shall respond to the Committee and/or Union representative within thirty (30) days after the presentation of the grievance.

Step 2 - In the event that the Employer and the Union are unable to resolve the grievance at Step 1, the Union shall submit the grievance in writing to the Employer within thirty (30) days after the Employer's response at Step 1 and the Employer, the Union and the musician or musicians involved shall meet within ten (10) days thereafter and make every effort to attempt to amicably resolve the grievance. All parties shall have a reasonable opportunity to present evidence, argument and witnesses in support of their respective positions.

Step 3 - If the grievance is not resolved at Step 2, the Employer or the Union shall have the right within sixty (60) days thereafter to submit the grievance for final and binding arbitration before a mutually agreeable impartial third party. If the parties are unable to agree upon an impartial arbitrator within five (5) days thereafter, either party may submit the grievance for arbitration to the American Arbitration Association ("AAA") in accordance with its rules and regulations. If appropriate, either party may request expedited arbitration.

C.      The Arbitrator's authority shall be limited to the interpretation and application of the provisions of this Agreement. Such decision shall be final and binding and may be enforced by either party through appropriate judicial proceedings. The Arbitrator shall not have the authority to add to, subtract from, modify or amend any of the terms of this Agreement. The Arbitrator's fee and charges of the AAA shall be borne equally by the parties hereto. Both parties shall cooperate in making available to the other parties all information and evidence relevant to the processing of the grievance.

D.      Notice of and Procedure for Non-Reengagement for Artistic Reasons:

If the Employer should desire, for artistic reasons, not to reengage any member currently on the orchestra tenure list (Appendix A), it must give written notice of non-reengagement to the musician, setting forth all reasons upon which such notice is based, no later than March 15 prior to the season for which such non-reengagement is intended to be effective. Copies of such notices shall simultaneously be provided to the Orchestra Committee and the Union. All musicians not given notice of non-reengagement shall be deemed re-engaged for the following season. This procedure shall also apply to demotion. However, in the case of a change of Music Director, no dismissal or demotion for artistic reasons shall be initiated for a period of two (2) years. For purposes of this provision, two (2)

years shall be considered to be the last year of the out-going Music Director's tenure, followed by the first year of the incoming Music Director's tenure

1.     If the musician who has been given notice of non-reengagement for artistic reasons wishes to protest such action, the Audition Committee, which shall include two (2) members of the Orchestra Committee, shall review such notice of non-reengagement.  If the Audition Committee finds the notice unwarranted, it shall attempt to adjust the dispute by meeting with the Employer, including the Music Director. In the event the Audition Committee finds the proposed non-re-engagement warranted or fails to act in the musician's behalf, the musician can appeal directly to the Executive Board of the Union.

2.     If the Orchestra Committee and/or the Executive Board of the Union find the proposed non-reengagement unwarranted, the notice shall be rescinded pending the conclusion of this procedure.

3.     Should the finding of the Executive Board of the Union and/or the Orchestra Committee be disputed by the Employer, the Executive Board of the Union shall meet with the Employer (including the person responsible for the non-reengagement decision) and the Orchestra Committee in an effort to resolve the dispute.  Should the parties, after diligent effort, be unable to resolve the dispute, the question of the justification for the proposed non-reengagement shall be submitted to arbitration in the following manner:

a.     The Union/Orchestra Committee and the Employer shall each select a member of a Board of Arbitration.  These two members of the Board of Arbitration shall attempt jointly to agree upon a third member of the Board of Arbitration.

b.     Should the bilateral members of the Board of Arbitration be unable to select a third member, the parties shall request a panel of arbitrators from the AAA, every attempt being made to assure that the arbitrator is musically qualified.  If they experience difficulty in selecting an arbitrator in this manner, the parties may request panels from the AAA in accordance with its rules.

c.     The parties shall bear equally the expenses of the third member of the Board of Arbitration.

d.     The decision of the Board of Arbitration shall be final and binding on all parties and on the musician involved.  Arbitration proceedings shall be conducted in accordance with The Voluntary Labor Arbitration Rules of the AAA.

e.     The Board of Arbitration shall make every attempt to issue a written decision and award within thirty (30) days of the conclusion of the proceeding in order that the Employer and Subject musician may plan accordingly.

## ARTICLE 4 - NO STRIKE/NO LOCKOUT

The Union agrees that during the term of this Agreement it will not cause a strike under any of the specific terms and provisions of this Agreement; and the Employer agrees similarly that during the term of the Agreement it will not cause any lockout.

## ARTICLE 5 - AUDITION PROCEDURE

Audition Procedures:  The employer shall adhere to the following audition procedure to fill positions which will be vacant for at least one full season.

A.      "The Audition Committee shall include the Music Director and three tenured or probationary orchestra members elected from the composite section (i.e.) strings and harp, brass and percussion, woodwinds, etc.) in which there is an opening. Each elected representative on the Audition Committee will be appointed by a vote of the orchestra at large and will serve for the duration of the contract.

Other tenured or probationary orchestra members shall be mandated to serve on the Audition Committee without being appointed by a vote of the orchestra.

They are:

1.      When the opening is in a string section: the concertmaster and the principal of the section having the opening. If the opening is in the Violin I section, Principal Violin II.

2.      When the opening is for a non-string position: all principals of the composite section of the opening.

3.      When the opening is for a titled chair: all principals of the composite section (strings, winds, etc.).

B.      The Audition Committee shall be polled to recommend:

1.      Whether to appoint a musician without audition pursuant to a two-thirds (2/3)s majority of the audition committee votes that remain once the Music Director has cast his/her fifty-one percent (51%) of all available votes.

2.      Whether to hold preliminary auditions.

3.      Whether to pass certain candidates directly to final auditions.

4.      Whether to insist on the use of screens to assure anonymity.

5.      What material to be performed.

6.      The system for evaluating candidates.

7.      With the Employer decide on location of audition, scheduling and facilities (warm up room, etc.).

C.      No audition shall last less than five (5) minutes.

D.      The Employer, in consultation with the Music Director and the other members of the Audition Committee shall decide on the scheduling of auditions. In the event that a member of the Audition Committee becomes unavailable at any time during the audition process, the remaining members of the Committee shall elect an alternate, such that at least two members of the affected orchestra section (i.e., the woodwind section for a clarinet audition) are present. The Music Director may be present for all auditions contingent upon his availability.

E.      Each committee member other than the Music Director shall have one vote. The Music Director shall have a number of votes equal to the rest of the committee. In the event of a tie vote, the Music Director or designate shall cast one additional vote to break the tie.

F.      If the Audition Committee is unable to select a principal player after an audition, it may select up to three musicians from among those auditioning, to perform with the orchestra during the next season as a final audition.

G.      If the Music Director requests a meeting of the Audition Committee, the request from the Music Director shall come from Management, and shall include a list of three (3) proposed, varied dates for the meeting, and will be put in writing to the Chairman of the Audition Committee. The Chairman of the Committee must submit a response by either mail, telephone or in person to Management. In the case of a postal response, the date of the postmark must fall